IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

MELISSA KELLEY                                                                                    PLAINTIFF

v.                                          NO. 3:17-cv-00285 PSH

NANCY A. BERRYHILL, Acting Commissioner                                        DEFENDANT
of the Social Security Administration

MEMORANDUM OPINION AND ORDER

Plaintiff Melissa Kelley ("Kelley") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Kelley maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] Specifically, Kelley maintains that her residual functional capacity was erroneously assessed. It is Kelley's contention that good reasons were not given for discounting the medical opinions of her treating physician.

Kelley alleged in her applications for disability insurance benefits and supplemental security income payments that she became disabled on July 22, 2015. She alleged that she became disabled because of, inter alia, a soft tissue injury to a lower limb, polymyositis, and arthritis.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

Kelley ably summarized the evidence in the record, and the Commissioner did not challenge the summary. It will not be reproduced, except to note matters germane to the issues raised in the parties' briefs.

On July 22, 2015, Kelley was admitted to St. Bernards Regional Medical Center for cellulitis of the left leg. See Transcript at 535-579, 615. CT scans revealed "worsening edema and sinus of quadriceps muscle with multiple fluid collection." See Transcript at 633. An incision and drainage with debridement and open packing was performed by Dr. Claiborne Moseley, M.D., ("Moseley). Kelley was discharged on August 4, 2015, at which time she was diagnosed with abscess with cellulitis and type 2 diabetes mellitus, controlled. She was prescribed a continuous IV infusion of Nafcillin and instructed to follow up closely with infectious disease. Home health and physical therapy were also prescribed.

Kelley was thereafter seen for follow-up examinations at the St. Bernards Wound Healing Clinic. See Transcript at 514-533 (08/14/2015), 511-513 (08/18/2015), 489-508 (08/21/2015), 468-487 (08/28/2015), 449-467 (09/04/2015), 431-448 (09/11/2015), 410-430 (09/25/2015), 392-409 (10/09/2015). The progress notes from the examinations reveal that her wound healed satisfactorily, and her condition improved over time.

During the period Kelley was recovering from surgery, she also saw Dr. Carl Abraham, M.D., ("Abraham"), an infectious disease consultant. When Kelley saw him on August 11, 2015, she reported left thigh pain exacerbated by walking but improved by propping her leg up and taking medication. See Transcript at 633-635. A catheter was removed, the intravenous Nafcillin was stopped, and oral Cephalexin was begun.

2

Kelley saw Abraham on August 18, 2015. See Transcript at 622-625. Kelley reported a left thigh ache at the location of the prior abscess. She rated the pain 3/10. It was a sharp, burning pain without radiation, "better with relief of weight bearing and worse with walking." See Transcript at 622. They discussed Abraham's concerns regarding Kelley's uncontrolled blood sugar and elevated sedimentation rate, and she was told that her diabetes and uncontrolled blood sugar would increase her risk of infection and slow the healing of her wound. He also recommended that she stop smoking. He recommended an MRI and x-rays to rule out osteomyelitis.

On September 4, 2015, an MRI was taken of Kelley's upper left leg. See Transcript at 620-621. The results showed a "fluid collection within the left vastus lateralis muscle. Osteomyelitis was not seen. Antibiotics were changed to doxycycline." See Transcript at 615.

Kelley saw Abraham again on October 7, 2015. See Transcript at 615-618. Kelley was found to be "much improved," see Transcript at 615, and "doing well," see Transcript at 617. She denied pain in her left thigh, and her wound was healing. A review of her symptoms was positive for fatigue, and her gait was slightly antalgic. Abraham discharged Kelley from his care but not before he recommended, in part, the following: continue use of doxycycline, continue follow-up at St. Bernards Wound Healing Clinic, stop smoking, and consult her primary care physician about smoking cessation and high blood pressure. Abraham's final diagnoses included sepsis secondary to left lower extremity cellulitis/abscesses secondary to methicillin-sensitive Staphylococcus aureus; type 2 diabetes mellitus, uncontrolled; and status-post incision and drainage with debridement of left thigh.

3

During the period Kelley was recovering from surgery, she also saw Moseley. When Kelley was seen on August 14, 2015, she complained of hip pain. See Transcript at 593-596. Moseley observed that Kelley was still wearing a vacuum-assisted closure device on her wound. Her swelling, though, had gone "way down," and she was walking "fairly well." See Transcript at 594. His assessment was that she was doing great.

Kelley saw Moseley again on October 9, 2015. See Transcript at 590-592. Kelley reported some soreness in her left thigh and knee. Her thigh had not "drained" in over a month, but it was "working." See Transcript at 590. Moseley observed that her knee problem was a bigger concern than her thigh soreness. He also observed the following: "… her lateral wound has healed over. The muscle is still a little patchy with swelling, but it is not particularly tender. Her [range of motion] of the knee is normal, and she is walking with a bit of a limp on that side, but not bad." See Transcript at 591. He assessed ineffective myositis of the left thigh and continued her on medication.

During the period Kelley was recovering from surgery, she was also seen by her treating physician, Dr. Carrie Hunter, M.D., ("Hunter").[2] When Kelley saw Hunter on August 13, 2015, Kelley reported no significant difficulties. See Transcript at 586-588. Her condition was improving, and she was encouraged to continue with specialty care.

Kelley saw Hunter on September 14, 2015. See Transcript at 584-585. Hunter observed that Kelley's wound was healing, and her blood pressure was "much better controlled." See Transcript at 584. Hunter diagnosed, inter alia, an open wound and infective myositis and continued Kelley on her medication.

---

[2] Kelley saw Hunter on multiple occasions prior to Kelley's admission to St. Bernards Regional Medical Center on July 22, 2015. See Transcript at 301-328. The progress notes compiled by Hunter during that period reflect that Kelley repeatedly complained of pain in her left thigh. Kelley's condition became of such concern that Hunter caused Kelley to be admitted to St. Bernards Regional Medical Center. See Transcript at 301-304.

4

Kelley saw Hunter on October 19, 2015. See Transcript at 581-583. Kelley reported that her wound had cleared, and she had been released from Abraham's care. Kelley nevertheless reported leg and knee pain. A review of her symptoms was unremarkable. Hunter diagnosed restless leg syndrome, knee pain, an abnormal surgical wound, type 2 diabetes mellitus, and essential hypertension. With respect to Kelley's abnormal surgical wound, Hunter observed the following:

> … Although the wound is closed, [Kelley] continues to have some remaining infection on MRI that ortho and ID have told her that is not going to be addressed at this time. She has some nerve damage due to the recent infection and necessary surgery. Will try some mirapex, but the more concerning problem is the knee. [Kelley] tells me ortho has told her there isn't much that can be done here. She can't stand or walk for more than 15 minutes without having to sit down. Even with sitting, she has parasthesias in the [left lower extremity] requiring her to frequently change position. I will not release her to return to her previous job as it requires almost constant standing and walking and lifting, which she is unable to do. An office job would be better, but I do not think she would be able to sit for the required period of time without requiring frequent changes in position.

See Transcript at 582.[3]

---

[3] Hunter's opinions addressed Kelley's abilities to stand, walk, and sit. Hunter's opinions did not address Kelley's abilities to lift or carry. For that reason, the Court need not reproduce the evidence relevant to Kelley's left shoulder impairment. Instead, the Court simply notes that when Kelley saw Hunter on April 18, 2016, Kelley reported pain in her left shoulder that was apparently caused by a fall she took approximately four months earlier. See Transcript at 603-605. A physical examination revealed that Kelley had a limited range of motion in her left shoulder. Hunter diagnosed, inter alia, left shoulder pain and suspected a rotator cuff injury. Kelley thereafter sought medical attention for her left shoulder pain from Dr. Spencer Guinn, M.D., ("Guinn"). She saw him on May 18, 2016, at which time she reported that she could not raise her arm over her head. See Transcript at 649-651. A physical examination showed that Kelley had a normal gait and full, but passive and painful, range of motion. Guinn ordered physical therapy. On May 24, 2016, Kelley underwent a physical therapy evaluation for her left shoulder impairment. See Transcript at 663. She reported worsening pain that caused her difficulties dressing, reaching above her head, and lifting objects. Testing revealed a decreased range of motion and reduced shoulder strength. On the heels of the evaluation, she underwent eight sessions of physical therapy for her left shoulder impairment between May 27, 2016, and June 15, 2016. See Transcript at 661-681. When Kelley saw Guinn again on July 6, 2016, Kelley reported significant improvement in her condition. See Transcript at 647-648. A physical examination revealed that she has full active and passive range of motion with 5/5 strength. He sent her back to therapy for a home strengthening program and emphasized the importance of exercising.

Kelley saw Hunter on November 19, 2015. See Transcript at 611-613. Kelley reported no real improvement and continued to experience left leg pain. Hunter noted that Kelley previously had "horribly" uncontrolled blood pressure. See Transcript at 611. Hunter's diagnoses remained largely unchanged.

Kelley saw Hunter on December 31, 2015. See Transcript at 608-610. Kelley reported that she had developed right leg pain. Hunter's diagnoses remained largely unchanged, and Hunter continued Kelley on medications that included Levemir, Mirapex, Neurotin, and Victoza.

Kelley saw Hunter on July 25, 2016. See Transcript at 640-642. Kelley reported that although her blood sugar levels and hypertension were better, she continued to experience neuropathy and restless leg syndrome. Kelley also reported the following:

> [Kelley] has [a] new complaint today of worsening [bilateral] upper and lower extremity numbness and tingling. These do not always occur at the same time. Driving, talking on phone, etc seems to aggravate the [upper extremity], while going from sitting to standing seems to aggravate the [lower extremity]. She reports she occasionally trips due to decreased sensation in her feet. She has neuropathy from her [diabetes mellitus], but believes things may be worsening.

See Transcript at 640. Hunter's diagnoses included type 2 diabetes mellitus with hyperglycemia, hypertension, and neuropathic pain.

Dr. Charles Friedman, M.D., ("Friedman"), a state agency medical consultant, reviewed Kelley's medical records and opined that she is capable of performing light work and has the ability to stand and/or walk for a total of six hours in an eight hour workday. See Transcript at 59-67. A second state agency consultant, Dr. Rita Allbright, M.D., ("Allbright"), opined likewise. See Transcript at 79-91.

A series of documents were completed by, or on behalf of, Kelley in connection with her applications. See Transcript at 209-288. In the documents, it was represented that, inter alia, she experiences pain in her left leg and knee every day. She can stand and/or walk for about fifteen to twenty minutes at one time before she must rest and can only walk for about one hundred feet before she must rest. She can sit for about thirty to forty-five minutes at one time. She can lift and/or carry no more than fifteen pounds at one time. She can attend to her own personal care, prepare simple meals, perform some household chores, and shop for groceries.

The record contains evidence of Kelley's work record. See Transcript at 192-206. The evidence reflects that her work record was good as she had meaningful earnings, particularly between 2000 and 2014.

Kelley testified during the administrative hearing. See Transcript at 42-52. She was born on August 20, 1965, and was fifty-one years old. She was graduated from high school and worked as a certified nursing assistant for approximately ten years. When asked what medical problems prevent her from working, she testified, "[s]tanding, stooping, diabetes problems, and I can't lift." See Transcript at 45. She also testified that she has a torn rotator cuff. Kelley takes Neurontin for her leg pain and Mirapex for her restless leg syndrome. She also takes medication for her hypertension, cholesterol, and a mental impairment. She can stand for about thirty minutes before requiring rest and can sit for thirty to forty-five minutes before requiring rest. She has difficulty lifting with her left arm because of her shoulder pain. Kelley does not believe she can work a job that would allow her to alternate between standing and sitting. She also does not believe she can work a job that would require lifting any significant weight.

The ALJ found at step two of the sequential evaluation process that Kelley's severe impairments include a "soft tissue injury of [her] lower limb." See Transcript at 15. He assessed her residual functional capacity and found that she can perform light work. With respect to her ability to stand and/or walk, he found the following: "[Kelley] can perform activities that require a good deal of walking or standing for six hours in an eight hour workday." See Transcript at 18. In so finding, the ALJ gave "some weight" to the opinions offered by Hunter on October 19, 2015, but declined to give the opinions "controlling weight." See Transcript at 23. The ALJ offered the following reasons for so weighing Hunter's opinions:

> Treating physician, Carrie Hunter, M.D., noted in [her October of] 2015 examination that [Kelley] cannot stand or walk for more than 15 minutes without having to sit down. Even with sitting, [Kelley] has parasthesias in the left lower extremity requiring her to frequently change positions. Although ... Hunter did not release [Kelley] to return to her previous job as it requires constant standing and walking and lifting, [Hunter] noted that [Kelley] could perform an office job but would have difficulty sitting. ... The [ALJ] gives some weight to this opinion to the extent that [the] opinion is consistent with the record showing that [Kelley's] limitations do not preclude work. In light of [Hunter's] status as [Kelley's] treating physician, the [ALJ] cannot assign controlling weight to [Hunter's] opinions because the opinion[s] expressed [are] quite conclusory, providing very little explanation of the evidence relied on in forming [the] opinion[s] and [do] not provide a function-by-function assessment of [Kelley's] limitations. In addition, [Kelley's] condition has substantially improved since ... Hunter gave her opinion[s].

See Transcript at 23. The ALJ found at step four that Kelley is capable of performing her past relevant work as a data entry clerk and was therefore not disabled for purposes of the Social Security Act. The ALJ made an alternative finding at step five and found that were Kelley unable to perform her past relevant work, there were other jobs she could perform.

Kelley maintains that her residual functional capacity was erroneously assessed. It is her contention that the ALJ did not give good reasons for discounting the opinions offered by Hunter on October 19, 2015.

The ALJ must assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). It is made using all of the relevant evidence in the record and must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of the assessment, the ALJ must consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's opinions are given controlling weight "if, and only if, [they are] well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence." See Winn v. Commissioner, 2018 WL 3322247, 3 (8th Cir. July 6, 2018) [internal quotations omitted].

Two of the reasons the ALJ gave for discounting Hunter's opinions are not particularly compelling.[4] Two other reasons, though, are good reasons for discounting the opinions and are supported by substantial evidence on the record as a whole. The ALJ could and did discount the opinions because Kelley's condition improved after Hunter offered her opinions, and Hunter's opinions are inconsistent with "the record showing that [Kelley's] limitations do not preclude work." See Transcript at 23. The Court so finds for the following reasons.

---

[4] The ALJ discounted Hunter's opinions, in part, because they are conclusory and provide little explanation of the evidence relied upon to form the opinions. Although Hunter's opinions are succinct, they are but one part of a larger medical record and should be read in the context of that record. The ALJ also discounted Hunter's opinions because they do not provide a function-by-function assessment of Kelley's limitations. As Kelley correctly maintains, though, it is not "entirely clear what the ALJ meant when he discounted ... Hunter's opinion[s] because [they do] not provide a 'function-by-function assessment' of Kelley's limitations." See Docket Entry 13 at CM/ECF 17.

First, Hunter's opinions are inconsistent with the progress notes she complied. The notes reflect that Kelley reported no significant difficulties when she saw Hunter on August 13, 2015, or less than one month after the surgery. Hunter's findings and observations were unremarkable and reflect that Kelley's condition was improving. Hunter made similar observations when she saw Kelley again on September 14, 2015. Approximately one month later, though, Hunter opined that Kelley was incapable of standing or walking for more than fifteen minutes and could only sit if she had the option of frequently changing positions. It is not clear how Hunter could have opined as she did in her October 19, 2015, progress note, and the record is devoid of any explanation for why Hunter could have believed Kelley's condition took such an extreme, and sudden, turn for the worse in only one month.

Second, Hunter's opinions are inconsistent with the other medical evidence. The progress notes from St. Bernards Wound Healing Clinic reflect that Kelley's condition improved over time. When Abraham saw Kelley on August 11, 2015, Kelley reported left thigh pain exacerbated by walking. When he saw her on October 7, 2015, he observed that she was much improved and was doing well. Kelley denied pain in her left thigh, and her wound was healing. Moseley also saw Kelley within a month of her surgery, and he too noted her complaints of pain. He observed, though, that her swelling was down, and she was walking fairly well. When he saw her again on October 9, 2015, he observed that although she was having knee problems and walking with a limp, her range of motion was normal. It is also worth observing that during a May 18, 2016, examination, a physician observed that Kelley had a "normal gait," see Transcript at 650, and Friedman and Allbright both opined that Kelley was capable of performing light work.

The governing standard, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of Kelley's residual functional capacity that limited her to light work. Kelley has not shown how the ALJ erred in doing so, and Hunter's opinions could be weighed as they were. In short, the ALJ could find as he did.

On the basis of the foregoing, there is substantial evidence on the record as a whole to support the ALJ's findings. Kelley's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 12th day of July, 2018.

_____
UNITED STATES MAGISTRATE JUDGE